# Exhibit "D"



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

DAVID DAY individually

And on behalf of a class of similarly

situated persons.

    Plaintiffs,

v.                                                                                 CASE NO.: 19-CV-015220VMC-TGW

                                                                               **CLASS ACTION**

SARASOTA DOCTORS HOSPITAL, INC.

d/b/a DOCTORS HOSPITAL OF SARASOTA

    Defendant.

_____/

**EXPERT WITNESS REPORT OF KEVIN M. MCCARTY**

### I.    Qualifications

1. My name is Kevin McCarty. I am an expert in insurance and insurance regulation. After I earned a bachelor's degree in Political Science and Juris Doctorate from the University of Florida, I began my career in insurance at the Florida Department of Labor, in the Division of Workers Compensation in 1988. As a research associate for the Division of Workers Compensation, I worked with the Bureau of Medical Services and Rehabilitation to analyze data from various sources and develop rules regarding utilization of medical services and appropriate reimbursement for physicians, hospitals, and other facilities. In addition, I analyzed various legislative proposals and made recommendations to the Director of the Division of Workers Compensation regarding legislative reform. Subsequently, as Chief of the Bureau of Industry Coordination, I advised the Three-Member Panel on cost containment, quality of care, and issues relating to the fee schedules for hospitals and others. I was also responsible for residual markets including workers compensation and auto insurance. Later as Deputy Commissioner, I was responsible for the review of policy forms and rates for both Property & Casualty, and Life & Health insurers, and for the public policy issues surrounding

insurance rates and forms, as well as advising the insurance commissioner on public policy matters including workers compensation and auto insurance.

2. In 2003, I was appointed as the Florida Insurance Commissioner by the Florida Governor and Cabinet sitting as the newly formed Financial Services Commission. In this role, I oversaw insurance company regulation for the State of Florida including Automobile Insurance (including PIP), Property, Workers Compensation, Health, Life, and many other lines of business and insurance-related entities.  Under my leadership, the Office of Insurance Regulation (successor to the Department of Insurance (DOI)) regulated the solvency of insurers, reviewed rate and form filings, and participated in many public policy issues at the state, national and international level.  I testified before Congress on several occasions including a hearing on Long Term Care and as an advocate for a National Catastrophe Plan. I was active at the National Association of Insurance Commissioners (NAIC) throughout my tenure, focusing on International insurance regulatory issues.  I served as President of the NAIC in 2012, and held the offices of Secretary/Treasurer, Vice President, and President-Elect prior to that.  Overall, with more than 27 years of experience including 13 years as Florida's Insurance Commissioner (2003-2016), I became recognized by my colleagues in the industry and the regulatory community as a national and international leader on insurance markets, insurance regulation, global capital markets, and public policy.

3. As Insurance Commissioner, I was the leader of a 292-member team at the Office of Insurance Regulation and an annual budget of more than $30 million. I guided our efforts to foster a competitive and robust insurance marketplace, taking actions that encouraged business growth and capital opportunities. At the same time, I entered orders and took steps to enhance and enforce protections for consumers, especially for the most vulnerable populations within the nation's third most populous state. For example, as Commissioner, I led the investigation and coordinated the national effort that changed the business practices of life insurers to require insurers to make a reasonable effort to seek beneficiaries to ensure that they received the benefits of the life insurance contract purchased by their loved ones. Our investigation resulted in a return of more than $11 billion to beneficiaries and the state unclaimed property offices. The investigation, and my leadership, were featured in a *60 Minutes* story aired in 2016. I also led investigations into unfair claim settlement practices, unfair practices in underwriting such as the refusal to insure based on plans for future lawful travel, and the use of credit scoring in insurance which although permitted under Florida law, did not allow insurers to discriminate unfairly based on certain factors.

4. I have been honored to receive numerous awards during my career. These include: Regulator of the Year by LexisNexis (2008); the Spirit of Independence Award from the National Association of Health Underwriters (2011); Lifetime Achievement Award by the Florida Association for Insurance Reform (2015); Insurance Man of the Year by the Latin American Association of Insurance Agencies (2015); and Distinguished Fellow by the International Association of Insurance Supervisors (2016).

2

5. During my tenure as Insurance Commissioner, Florida experienced significant challenges in various segments of insurance markets. I was involved with legislation to fix the ailing Florida auto market including reforms to address cost drivers in 2008 and 2012. As Florida's Chief Regulator, I was a stakeholder in public policy discussion regarding PIP Reform, cost drivers, and cost containment strategies. I also served as a chair of the Three-Member Panel, appointed by State of Florida Chief Financial Officer (CFO) Gallagher, then CFO Atwater, as their representative on the panel. Florida Statutes, Section 440.13 empowers the Three-Member Panel to establish the schedules for providers, ambulatory surgical centers, and hospitals. In addition to containment costs, the Panel works to ensure that medical services are readily available to ensure prompt quality care for injured workers.

6. As Commissioner, my responsibilities included monitoring the health care market for indemnity, PPO's, HMO's, as well as long-term care and Medicare Supplement, and other Health Insurance contracts. Part of these responsibilities included the review of healthcare rates charged by insurers for compliance with Florida Laws and Regulations. Review of rates included the review of underlying data on the cost of medical services for small group and individual markets, cost of medical services for individuals, and reimbursement for providers under programs such as Medicare and Medicaid.

7. In 2016, upon leaving office, I founded Celtic Global Consulting, LLC in Tallahassee. The firm serves state, national, and international clients, providing comprehensive services focused on insurance issues and trends. Celtic Global Consulting clients range from government agencies, insurance companies, other insurance-related organizations to corporations and investors who tap into the firm's expertise in such areas as advanced financial analysis, regulatory assessments, and advocacy on high-stakes issues and legislation. Celtic Global Consulting collaborates with other professionals to meet a variety of client needs.

II.   **Compensation**

8. I am being compensated at a variable hourly rate of $400-$650 an hour. My compensation is not contingent upon the success of the litigation.

III.   **Assignment and Summary of Opinions**

9. I have been asked by Counsel to David Day and the other Plaintiffs to provide an opinion on the billing practices of Doctors Hospital of Sarasota under various laws and regulations, including the Personal Injury Protection (PIP) statute. For this assignment, I am drawing upon the qualifications set out above, as well as documents provided to me by Counsel, and listed in Materials Reviewed.

10. The PIP statute contains provisions aimed at preventing PIP patients for being overcharged by healthcare providers and requiring them to charge reasonable amounts consistent with the same services provided to non-PIP patients. In my opinion, Doctors Hospital of Sarasota is charging PIP patients and insurers excessive fees for the services provided: they are being charged at unreasonably high rates far above what Medicare and private patients are paying for identical services.

11. To justify its exorbitant rates, Doctors Hospital of Sarasota appears to be arguing that its chargemaster is its "usual and customary charges" for medical services, including radiological services, in Florida. But that position is inconsistent with common understanding in the industry and contrary to what my Office understood that term to mean. Usual and customary charges can be either what the community of payors remits to a community of healthcare providers for a service, or what the healthcare provider accepts from its different payors. For Doctors Hospital of Sarasota, the PIP patients appear to pay far more than what Doctors Hospital of Sarasota usually and customarily accepts for emergency room radiological services. Furthermore, accepting Doctors Hospital of Sarasota's position that its own subjective chargemaster, which has high costs that would undercut the PIP statutory framework with the goal of preventing PIP patients from being discriminated against and paying amounts that are unreasonable compared to what non-PIP patients are paying.

IV.   **Opinion**

    A.   **Reimbursement for Medical Providers, Facilities, and Hospitals**

12. Reimbursement for medical providers, facilities, and hospitals is driven by who the payor is for services rendered. This reimbursement for most providers is driven by the federal government since approximately 40% of Florida's population is covered under Medicare, Medicaid, or both. Prior to the Omnibus Budget Reconciliation Act (OBRA) of 1989, Medicare paid for medical services and hospitals using the *usual and customary* charges. *Usual and customary* charges was the reimbursement method then used by private health insurers for all patients and today is used in a relatively small number of cases where the individual provider or the particular service is not covered by a negotiated contract or reimbursed in accordance with a fee schedule.

13. *Usual and customary* was an attempt by insurers to curb rising medical cost and to discourage arbitrary billing practices for procedures or services. There can be a *usual and customary* charge standard for a provider, individual facility, hospital, or of the reimbursement accepted generally in the community of like providers in a geographical area. The insurer would adjust the reimbursement for medical services or procedure to reflect an amount not to exceed what was the norm for that medical procedure or service by other providers in the geographic area. In other words, what would a provider accept as reimbursements for that service. An insurer determines *usual and customary* from its own database or from a firm that collects claims

4

data from a number of insurers and provides the data for a fee. The phrase "usually charged" is commonly understood to mean what is usually charged and accepted by the medical provider.

### B. Paradigm Shift in Reimbursement Methodology

14. The Social Security Amendments of 1983 changed the method of inpatient hospital payment for Medicare enrollees from a cost-based, retrospective reimbursement system to a diagnosis based "prospective payment system." Similarly, the OBRA of 1989 moved from a charged based system to a resource based relative value-based fee schedule (RBRVS) for reimbursement of service by medical providers.

15. Reimbursements for inpatient hospital stays are based on a Diagnosis Related Group (DRG). Patients with similar clinical conditions and similar treatment costs are assigned a particular code that reflects the relative costs for treating the patient and are adjusted geographically. DRG is a "prospective reimbursement" which means the hospital and physician are given a predetermined fixed amount for the particular type of service they provide a patient. Therefore, there is an incentive for cost containment and a disincentive for increasing unnecessary services since the reimbursement is the same. Regardless, this encourages hospital efficiency. Medicare's "prospective payment system" was an important innovation of medical financing. Most insurers have some adaptation of the DRG system for their method of reimbursement for hospitals. Usually insurers use Medicare's DRG's grouping, assigning varying weights to the individual DRGs. For physicians, reimbursements are predicated on the Resource Based Relative Value Scale (RBRVS). The RBRVS framework established various codes for medical procedures and reimbursement reflecting relative value and costs for each procedure. DRG and RBRVS were both designed to modernize and strategize reimbursement procedures for Medicare payment for hospitals and providers. Today most private payors benchmark their reimbursements off the Medicare system.

16. Medicare has been transformational in the world of healthcare reimbursement. Even though Medicare accounts for 20% of the market, other non-Medicare payors have adopted the Medicare methodology in their basis for reimbursement.

### C. Personal Injury Protection (PIP) Insurance Coverage and Medical Reimbursement

17. Florida adopted sweeping reforms to ailing auto insurance markets in 1971, becoming one of the first states to reject the traditional tort system for resolution of auto accident disputes for a bold new concept called no-fault. The no-fault plan provided a system whereby the injured party would be compensated promptly for injuries sustained in an auto accident, regardless of fault. The overarching principle of a no-fault system is in exchange for providing prompt payment of specified benefits, the parties are thereby limited in their ability

5

to sue. This system is not unlike the workers compensation system wherein the injured worker forgoes the right to sue for damages against their employer in exchange for prompt medical care and the payment of indemnity benefits.

18. The legislature's intent of the no-fault law was articulated by the Florida Supreme Court in 1974 in Lasky vs. State, 296 So.2d 9 (Fla. 1974). The court laid out the following pillars of Florida's no-fault system.
    - Compensate persons injured in an automobile accident, <u>even</u> if the injured party was at fault, thereby avoiding potential financial ruin and the possibility of swelling the public relief rolls.
    - Reducing the number of court cases in an already overburdened legal system as well as lessening the delays in the court calendar.
    - Lower automobile rates.
    - Provide more equitable recovery than the traditional tort system.

19. The overall architecture of the PIP system was to provide a vulnerable population with access to healthcare services in the event of an accident. An integral part of that architecture is the prompt payment of claims to achieve one of the main objectives of the system—to assure the injured party receives quality medical services without delay. The no-fault law was revised over the past 46 years since the passage of PIP with certain cost-containment programs that support two important goals: a) that benefits are available to pay for the injured party's medical bills; and b) to contain costs. Under PIP, Insurance Companies were required to pay within specific timeframes (30 days from report of claim) and medical providers could only bill a reasonable amount for services provided. In the ensuing years, the legislature made several revisions to the PIP law to address concerns about potential abuse and or fraud that jeopardized the benefits available to pay for future claims as well as to reign in rising costs of the system; two of the main pillars of the PIP system. These revisions include requiring licensing of certain clinics, and imposing limits on specified diagnostic procedures with the goal of reducing the abuse which leads to higher costs and preventing the PIP benefits from being exhausted.

20. The PIP law provides that medical providers be compensated only for "medically necessary" services and supplies. The charges may not exceed the amount the person or facility customarily charges for like services or supplies. §627.736(5)(a). In making the determination of what is reasonable, consideration may be given to what is the "usual and customary charges and payments accepted by the provider." This includes reimbursement levels in the area as well as reimbursement allowed for Medicare and Medicaid fee schedules for other coverages in the state, and any other information relevant to determining what is a reasonable amount to compensate for a service or treatment.[1]

---

[1] Until reform in 2008, Florida did not impose a fee schedule for PIP except for a limited number of diagnostic procedures. That schedule does not apply to emergency services. Sec. 627.736(5)(a)(1)(d) and (e). For emergency

21. One of the standards for determining the "usual and customary charge" within the health care industry is the amount a provider accepts for payment for services or treatment rendered. This standard is used in the context of the Florida Medicaid program. In that context, Florida law sets fee-for-service rates at the lesser end of the amount billed, the usual and customary charge, or the maximum fee established by CMS.

22. For Workers' Compensation, the Three-Member Panel received testimony on determining *usual and customary* charges. The testimony supported the position that there is no correlation between the *usual and customary* charges and the hospital chargemaster.

23. Based on my experience in the Division of Workers' Compensation, my years as Insurance Commissioner, the deliberations of the Three-Member Panel, and my involvement in legislative meetings regarding the changes proposed to the PIP law, I can state that the term *usual and customary* was used in all of these discussions. The term *usual and customary* in all of these contexts was used to describe a reimbursement for services that is usually paid and accepted by providers and was never used to simply mean the amount listed in the chargemaster of a hospital.

24. All hospitals use a chargemaster[2], which is comprised of a comprehensive listing of prices for all services, diagnostic tests, medical procedures, supplies, medicines and equipment fees, and other items for which a hospital might bill a patient, insurer or other payor. Oftentimes hospital billing departments are largely unaware of how a charge master is developed or how prices are determined. With the notable exception of Maryland and West Virginia, where hospital charges are regulated by the state, hospitals have complete freedom to set their chargemaster rates, i.e., prices. As a result, hospital charges significantly exceed the cost of providing patient care and fluctuate greatly from one facility to the next. Many analysts and regulators have pointed out that the chargemaster primarily functions as a negotiating tool, since "gross charges"—the term used for chargemaster rates in the Affordable Care Act (ACA) and final regulations—are often used as a starting point in providers' negotiations with private insurance carriers. Some private insurers determine their reimbursement from Medicare and ignore the chargemaster. Private insurers usually have negotiated rates far below the hospital chargemaster. Medicare and Medicaid, both public coverage programs, set their own rates for paying providers, and these rates are also less than gross charges. A

---

services, the insurer may pay up to 75% of the usual and customary charges. Sec. 627.736(5)(a)(1)(b). As explained here, the usual and customary charges do not mean the healthcare provider's chargemaster price, but rather what is billed and accepted for payment.

[2] The regulations use the technical terms "gross charges" and "chargemaster rate" interchangeably: both are defined as the "full, established price for medical care that the hospital facility consistently and uniformly charges all patients before applying any contractual allowances, discounts or deductions." Treas. Reg. §1.501(r)-1(b)(16). These terms refer to the listed prices hospitals set, prior to negotiating payments with private insurers or accepting public payers' rates. By contrast, the regulations define the amount "charged" to a patient as the amount a patient is personally responsible for paying after all deductions, discounts (including financial assistance), and insurance payments have been applied. Treas. Reg. §1.501(r)- 5(b)(2). On a standard hospital bill, this will be the amount the patient owes and is asked to pay.

particularly cruel consequence of the chargemaster system is that patients without adequate insurance coverage, particularly the uninsured, may be the only patients who receive hospital bills that request they pay gross charges. Recently promulgated rules under the ACA attempts to protect some consumers from being victimized by hospitals. Unfortunately, those protections are limited to not for profit hospitals and apply to patients that qualify for financial assistance rather than addressing overcharging in general.  As a consequence, many patients who have no bargaining clout with a hospital (and executed a contract of adhesion upon entering the hospital) and with very limited financial resources are asked and often expected to pay for care at rates that are much higher than those paid by either private insurance companies or public payors. These regulations establish a limit for charges for medically necessary and emergency care: patients who are eligible for financial assistance cannot be charged more for these services than the "amounts generally billed" (AGB) to an insured patient.[3]

25. In reality, the hospital chargemaster rate cannot reasonably qualify as the usual and customary charge accepted as payment by hospitals for PIP or any other patient. In fact, the chargemaster prices are largely irrelevant to what a patient is expected to pay or what amount is actually paid as reimbursement to the hospital

26. In fact, many private insurers pay a flat fee for their emergency departments services, as opposed to either 100% of the chargemaster rates, or the 75% of the chargemaster rates that Doctors Hospital of Sarasota says it will accept for insurer reimbursement for PIP patients. Given that chargemaster is consistently ignored or significantly discounted in determining reimbursement to hospitals and the  hospital routinely accepts payments for less than the chargemaster, it cannot serve as the basis of determining usual and customary charge or a reasonable amount  that the hospital is actually accepting for services.

27. The basis for establishing the price determination contained in the hospital chargemaster used by Doctors Hospital of Sarasota is unclear. However, it is my understanding that the determination of pricing Doctors Hospital of Sarasota does not take into consideration reimbursement from CMS for Medicare or Medicaid. Likewise, it does not take into consideration other third-party payors or other reimbursements accepted as payment when determining a reasonableness of the charges or for billing for medical services under the Florida PIP law.[4]

28. Doctors Hospital of Sarasota maintains the necessary records to determine a reasonable charge for a medical procedure for PIP.[5]

---

[3] What Does the Affordable Care Act Say about Hospital Bills? June 15, 2015. Jessica Curtis
[4] Deposition Transcript of Lisa Berryhill
[5] Deposition Transcript of Lisa Berryhill

8

29. Doctors Hospital of Sarasota maintains records of reimbursement received from third party payors and as well as reimbursement received for Medicare or payments received under other state or federally promulgated schedule.[6]

30. My understanding is that most of Doctors Hospital of Sarasota patients have either private health insurance from one of the major insurance carriers, or Medicare/Medicaid. None of these payors pay 100% of the chargemaster prices. To treat the chargemaster as the *usual and customary* charge or the basis for determining reimbursement under the PIP law would result in excessive charges for such patients and result in PIP-covered claims paying much more than similarly situated patients covered by insurance or Medicare.

31. Furthermore, allowing a hospital to charge and collect in accordance with the chargemaster would extinguish the entire PIP benefit and deny one of the principle tenets of the no-fault law. Cost containment was one of the overriding purposes of the PIP law and recent amendments. Cost containment, or the prevention of overcharging, is central to the PIP statutory structure, which also includes an exhaustible benefit. Without cost containment, the exhaustible PIP benefit (of $10,000 or $2500) would be meaningless as providers could charge exorbitant amounts to PIP insurers, thus leaving PIP patients with no benefit remaining for necessary medical services. The cost containment components of the PIP law also protect drivers who pay PIP premiums because their insurance premiums grow when unreasonably high PIP payments are made to providers. Such cost containment cannot happen if PIP patients are charged rates (even discounted by 25%) that are well above what the vast majority of patients pay at Doctors Hospital of Sarasota. There was never any intent or discussion during my tenure as Insurance Commissioner that would support an interpretation of legislative intent that the PIP law was being amended to allow hospitals to charge more for PIP patients. There was not a discussion at the time of that amendment that the legislature intended to allow hospitals to bill from its own invented chargemaster—which it can annually increase at any rate it wishes—rather than the three alternatives written into the statute (what it ordinary accepts from private payors; community reimbursement rates; state or federal fee schedules). In fact, the discussions were centered on lowering PIP rates, and doing so by containing costs and preventing fraud, while providing prompt quality medical care for injured parties. This is consistent with the tenets of the PIP law since its inception.

32. Doctors Hospital of Sarasota knew or should have known that using the chargemaster for billing PIP patients was excessive and beyond what the hospital receives from other patients for the same medical services. Charging PIP-covered patients using the hospital chargemaster is inconsistent with the Florida PIP law which prohibits medical providers from charging more than reasonable amount and/or charging PIP-covered medical services in excess of what is customary for patients receiving like services.

---

[6] Deposition Transcript of Lisa Berryhill

9

**V.      Conclusion**

33. In my opinion and my experience, the PIP law was intended to protect PIP patients from being discriminated against in pricing by health care providers. It was known that their automobile insurance companies were not likely to negotiate with hospitals, or dispute their charges, because the capped amount of coverage was too low to be of consequence to the insurers and the insurer lacked the economic clout to negotiate a lower reimbursement amount. Therefore, the current PIP architecture was created to protect the insurers from being overcharged and the legislature required health care providers to charge PIP patients a "reasonable" amount – basically, what the medical provider was accepting for payment for patients covered by private health insurance or Medicare/Medicaid or payment pursuant to a fee schedule.  The conduct of Doctors Hospital of Sarasota is inconsistent with this framework, as they effectively single out PIP patients for higher charges than non-PIP patients. By using up the limited money available under their PIP policies, Doctors Hospital of Sarasota conduct increases the financial burdens on the PIP patient and does not aid in cost containment. Furthermore, the hospital may deprive some of the patients of further medically necessary services by systematically overcharging PIP patients and exhausting their benefits.

10

## VI. Materials Reviewed for This Report

In addition to the appropriate statutes that I am familiar with and referred to herein, the following materials were provided to me by counsel:

1. Legislative History for Fl. Stat. §627.736
2. What Does the Affordable Care Act Say about Hospital Bills?
3. Deposition of Lisa S. Berryhill
4. Second Amended Complaint and Demand for Jury Trial
5. Sarasota 0921-0924
6. Protective Order Regarding Confidentiality
7. Sarasota Doctors Hospital's Motion to Dismiss Second Amended Complaint and Strike Demand for Jury Trial

Kevin McCarty

Manager

Celtic Global Consulting