UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID DAY,

       Plaintiff,

v.                                    Case No. 8:19-cv-1522-VMC-TGW

SARASOTA DOCTORS HOSPITAL,
INC. d/b/a DOCTORS HOSPITAL
OF SARASOTA,

       Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff David Day's Motion for Summary Judgment (Doc. # 186) and Defendant Sarasota Doctors Hospital, Inc.'s Motion for Summary Judgment, both filed on November 13, 2020. (Doc. # 187). The parties have responded (Doc. ## 197; 200) and replied to each Motion. (Doc. ## 207; 208). For the reasons set forth below, Doctors Hospital's Motion is granted, and Day's Motion is denied.

**I.   Background**

Following a motor vehicle accident on February 21, 2017, Day received emergency medical treatment at Doctors Hospital. (Doc. # 194-1 at 19:1-25). Upon arrival at the Hospital, Day signed a "Conditions of Admission and Consent for Outpatient Care" form ("COA"), which included provisions stipulating

1

that Day agreed to pay the rates listed in Doctors Hospital's chargemaster, and also noting that the Hospital accepted discounted rates from certain insured and uninsured patients:

> **5. Financial Agreement.** In consideration of the services to be rendered to Patient, Patient or Guarantor individually promises to pay the Patient's account at the rates stated in the hospital's price list (known as the Charge Master) effective on the date the charge is processed for the service provided, which rates are hereby expressly incorporated by reference as the price term of this agreement to pay the patient's account. Some special items will be priced separately if there is no price listed on the Charge Master. An estimate of the anticipated charges for services to be provided to the Patient is available upon request from the hospital. Estimates may vary significantly from the final charges based on a variety of factors, including, but not limited to, the course of treatment, intensity of care, physician practices, and the necessity of providing additional goods and services.
>
> * * *
>
> If supplies and services are provided to Patient who has coverage through a governmental program or through certain private health insurance plans, the hospital may accept a discount payment for those supplies and services. In this event any payment required from the Patient or Guarantor will be determined by the terms of the governmental program or private health insurance plan. If the Patient is uninsured and not covered by a governmental program, the Patient may be eligible to have his or her account discounted or forgiven under the hospital's uninsured discount or charity care programs in effect at the time of treatment. I understand that I may request information about these programs from the hospital.

(Doc. # 187-3 at 1-2) (emphasis in original). Day "probably"

did not read the COA before signing it. (Doc. # 194-1 at 144:1-146:1). Neither did he review the Hospital's chargemaster or visit the Hospital's website, where the chargemaster is published. (Id. at 144:21-24; Doc. # 194-6 at 115:20-116:13). Nor did he request an estimate of his charges before or after seeking treatment. (Doc. # 194-1 at 144:7-13). Still, before leaving the Hospital on February 21, 2017, Day paid $80 toward his medical treatment. (Id. at 31:17-18; Doc. # 194-7 at 2).

At the time of treatment, Day's only applicable form of insurance was a personal injury protection policy ("PIP" insurance) – also known as no-fault insurance – issued by Progressive. (Doc. # 194-1 at 30:24-31:2, 76:13-14; Doc. # 187-9 at 1). Florida law requires all motor vehicle owners to purchase PIP insurance, "which provides a maximum of $10,000 in medical coverage for injured drivers." Fla. Stat. § 627.736(1) (2020); (Doc. # 194-3 at 11). Under the PIP statute, hospitals and other healthcare providers must charge PIP insurers and injured parties "only a reasonable amount." Fla. Stat. § 627.736(5)(a); (Doc. # 194-3 at 11; Doc. # 205 at ¶ 1). "In exchange for [this] reasonable charge[,] no-fault insurance guarantee[s] [hospitals] prompt payment of medical bills." (Doc. # 186 at ¶ 4; Doc. # 172 at 3).

3

On February 25, 2017, Doctors Hospital submitted its claim for reimbursement for Day's medical treatment to Progressive. (Doc. # 194-8). The claim form included the Hospital's chargemaster rates: "$1,471 for an X-Ray of [Day's] shoulder; $1,621 for a Level Three emergency room visit; and $18 for dispensing [three pills of 800 milligrams of] ibuprofen, for a total of $3,110." (Id.; Doc. # 194 at ¶ 24; Doc. # 194-10). Progressive then issued an Explanation of Benefits ("EOB") to Doctors Hospital, providing for an allowable amount of $2,332.50, with the "allowable amount" representing "the combined amount to be paid by the insurance company . . . and the patient[.] The patient's responsibility can include a co-payment and/or deductible." (Doc. # 194-10 at 2-3; Doc. 194-3 at 5-6; Doc. # 194 at ¶ 27) (citation omitted).

This sum represents seventy-five percent of the $3,110 charged by Doctors Hospital. (Doc. # 194-10 at 2-3) ("The allowable amount has been calculated pursuant to Florida Statute 627.736(5) which limits reimbursement to 75% of the hospital's usual and customary charges for emergency services."). Of that $2,332.50, Progressive determined that Day owed the Hospital $1,246.50, which represented $975 from his policy's $1,000 deductible and a $271.50 co-payment.

4

(Id.; Doc. # 194-1 at 79:24-25, 88:22-89:3). Based on Progressive's calculations, Doctors Hospital sent Day a bill for $1,146.50, reflecting his $1,246.50 responsibility, minus the $80 he paid on the day of treatment and a $20 prompt-pay discount. (Doc. # 194-7 at 2; Doc. # 194-9 at 63:7-66:7). Presently, Day has not paid this $1,146.50 balance. (Doc. # 194-1 at 76:1-14).

During discovery, Doctors Hospital provided Day with a number of its confidential contracts with private health insurers. Doctors Hospital's expert, Michael Heil, who has "[twenty-five] years' experience in management consulting for hospitals, health systems, medical groups, health plans, and emergency medical services agencies," then calculated what a patient would have been expected to pay Doctors Hospital for the services Day received if the patient were covered by those other insurers. (Doc. # 194-3 at 19-21; Doc. # 205 at 9).

The first relevant contract is one between Doctors Hospital and an insurer for certain outpatient services. (Id.). Under this contract, a patient would have paid $965 for the same services Day received. (Id.). The second and third relevant contracts were between Doctors Hospital and two insurers for bundled services. (Id.; 194-3 at 9-11). Insurers and hospitals often contract with each other based

on bundles of services, rather than on a line-by-line basis. (Doc. # 193-1 at 151:13-21). With respect to those two contracts, a covered patient would have paid $2,946 under the second, and $2,070 under the third. (Doc. # 194-3 at 9).

Day initiated this action in state court on December 1, 2017. (Doc. # 1). Following the filing of an amended complaint, which included a putative class action, Doctors Hospital removed the case to this Court on June 24, 2019. (Id.). On July 23, 2020, the Court denied Day's motion to certify class. (Doc. # 155). Now, four claims remain against Doctors Hospital, including claims for violations of the Florida Deceptive Unfair Trade Practices Act ("FDUTPA") (Counts I and II), breach of contract (Count III), and declaratory relief (Count VI). (Doc. ## 42; 46; 86; 155). The parties both seek entry of summary judgment in their favor. (Doc. ## 186; 187). Each party has responded (Doc. ## 197; 200) and replied. (Doc. ## 207; 208). The Motions are now ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to

defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his [conclusory] allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary

judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

III. **Analysis**

Both parties have filed Motions for Summary Judgment. (Doc. ## 186; 187). The Court will address Doctors Hospital's Motion first, followed by Day's Motion.

A. **Doctors Hospital's Motion**

Doctors Hospital argues that it is entitled to an entry of judgment in its favor on all remaining counts of the second amended complaint. (Doc. # 194 at 1). The Court will address each of those counts in turn.

1. **Deceptive Act FDUTPA Violation**

In Count I, Day alleges that Doctors Hospital violated FDUTPA by "actively, willfully, and deceptively represent[ing] that the prices listed on the [chargemaster] are the 'customary charges,' rather than an artificially inflated list that only applies to a certain class of people, by publishing it on [their] website and in incorporating it into the [COA]." (Doc. # 46 at ¶ 92). Day avers that he "relied on this deceptive representation when [he] signed the [COA] and paid [the Hospital's] bills for PIP covered

emergency services," thereby causing him to "become obligated to pay excessive and artificially inflated medical bills . . . or become obligated to pay other health care providers out-of-pocket because [the Hospital's] inflated rates prematurely exhausted [Day's] PIP coverage."   (Id. at ¶ 94-95).

In its Motion, Doctors Hospital argues that it is entitled to judgment in its favor on Count I for the following reasons: (1) "Day was never misled" since "the undisputed evidence shows that [he] never visited the Hospital's website, nor did he review the payment provisions" in the COA and (2) the FDUTPA claim is precluded by a statutory safe harbor. (Doc. # 194 at 1-2). Day responds that a reasonable consumer would be deceived by the COA and that the safe harbor does not apply. (Doc. # 205 at 14-15).

"To prevail on [an] FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018). In this count, Day argues only that Doctors Hospital's conduct constituted a deceptive act. (Doc. # 46 at ¶ 86-97); (Doc. # 186 at 24) (arguing for summary judgment on Count I based solely on Doctors Hospital's conduct constituting a deceptive act).

Under FDUTPA, "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003) (citation omitted). "This standard requires a showing of 'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (citation omitted). "The test is an objective one and does not require a plaintiff to show actual reliance on the deceptive or unfair representation or omission." Maor v. Dollar Thrifty Auto. Grp., Inc., No. 15-22959-CIV-MARTINEZ-GOODMAN, 2018 WL 4698512, at *6 (S.D. Fla. Sept. 30, 2018). Still, "[w]hile proof of actual reliance is unnecessary, the first element of [an] FDUTPA claim is only satisfied by evaluating a reasonable consumer in the same circumstances as the plaintiff. The modification of 'acting reasonably' by 'in the same circumstances' indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context." Deere Constr. v. Cemex Constr. Materials Fla., LLC, No. 15-24375-CIV-ALTONAGA/O'Sullivan, 2016 WL 8542540, at *3 (S.D. Fla. Dec. 1, 2016) (citation

11

omitted).

Here, Day alleges that Doctors Hospital deceptively represented that the prices listed in its chargemaster, which were incorporated in the COA, were the customary charges, insofar as those numbers would be used to determine a PIP-insured patient's payment obligations. (Doc. # 46 at ¶ 94-95). However, the COA – which is provided to Doctors Hospital patients, including Day – features no such provision. (Doc. # 187-3). To the contrary, the COA explicitly states that both insured and uninsured patients are expected to pay rates other than those listed in the chargemaster:

> If supplies and services are provided to Patient who has coverage through a governmental program or through certain private health insurance plans, **the hospital may accept a discounted payment** for those supplies and services. In this event, **any payment required from the Patient or Guarantor will be determined by the terms of the governmental program or private health insurance plan**. If the Patient is uninsured and not covered by a governmental program, the Patient **may be eligible to have his or her account discounted or forgiven** under the hospital's uninsured discount or charity care program in effect at the time of treatment.

(Id. at 2) (emphases added). Therefore, with the evidence provided, no reasonable consumer would understand the COA to stand for the proposition that all Doctors Hospital patients pay the same chargemaster rates or that such rates necessarily constitute "customary charges." (Doc. # 46 at ¶ 92).

Because no reasonable consumer could be deceived by the Hospital's conduct or the COA, under the circumstances alleged in Count I, the Hospital's Motion is granted as to this requested relief. See Zlotnick, 480 F.3d at 1287 (affirming the dismissal of an FDUTPA claim where the words of the contract removed the "possibility that a reasonable purchaser would be misled").

## 2. Unfair Practice FDUTPA Violation

In Count II, Day alleges a second violation of FDUTPA, arguing that Doctors Hospital's billing methods constitute an unfair practice. (Doc. # 46 at ¶ 98-112); (Doc. # 186 at 24) (arguing for summary judgment on Count II based solely on Doctors Hospital's conduct constituting an unfair practice). Day posits that Doctors Hospital charged "exorbitant and unreasonable rates for PIP-covered healthcare services" in violation of the PIP statute, "which prohibits [hospitals] from charging more than a 'reasonable amount' for emergency medical services." (Doc. # 46 at ¶ 106-07). Day further posits that Doctors Hospital's "practice of not providing patients with itemized bills nor informing patient of their right to obtain itemized bills" violates FDUTPA. (Id. at ¶ 105).

In its Motion, Doctors Hospital argues that it is entitled to judgment in its favor on Count II for the

13

following reasons: (1) Day "has failed to adduce any evidence that his charges were unreasonable," and (2) the FDUTPA claim is precluded by a statutory safe harbor. (Doc. # 194 at 12, 16). Day responds that the evidence proves that Doctors Hospital's charges are inherently unreasonable and again argues that the safe harbor is inapplicable. (Doc. # 205 at 5, 15).

To prevail on an unfair practice FDUTPA claim, a plaintiff must show (1) an unfair practice, (2) causation, and (3) actual damages. State Farm, 315 F. Supp. 3d at 1300. "[A]n unfair practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Bookworld Trade, Inc. v. Daughters of St. Paul, Inc., 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting Rollins, Inc. v. Butland, 951 So.2d 860, 869 (Fla. 2d DCA 2006)).

Because Count II is primarily based on the premise that Doctors Hospital charged him an unreasonable rate for emergency medical care, the Court first turns to this issue. Under Florida law, "no single factor can be used to determine the reasonableness of [a hospital's] charges." Colomar v. Mercy Hosp., Inc., 461 F. Supp. 2d 1265, 1269 (S.D. Fla. 2006) (hereinafter, Colomar I). Instead, "several non-exclusive

factors are relevant to the inquiry," including: "(1) an analysis of the relevant market for hospital services (including the rates charged by other similarly situated hospitals for similar services); (2) the usual and customary rate [the hospital] charges and receives for its hospital services; and (3) [the hospital's] internal cost structure." Id. The Court will address each of these non-exhaustive factors in turn.

### a. Market Analysis

"Evidence of what other hospitals in the same market would have charged and accepted for the same services is [a] factor in the reasonableness inquiry." Colomar v. Mercy Hosp., Inc., No. 05-22409-CIV, 2007 WL 2083562, at *5 (S.D. Fla. July 20, 2007) (hereinafter, Colomar II). In his response to the instant Motion, Day offers the pricing of two other hospitals located near Doctors Hospital. (Doc. # 205 at 7 n.1). First, Sarasota Memorial Hospital allegedly charges "approximately $550.00 for [a] shoulder x-ray and $450.00 for [a] level 3 emergency visit." (Id.). "Venice Regional Bayfront currently charges around $614.89 for a shoulder x-ray." (Id.). By comparison, Doctors Hospital charged Day $1,471.00 for a left-shoulder x-ray and $1,621 for a level three emergency visit. (Doc. # 205 at 7; Doc. # 194-10).

15

According to Day, these charges are "two to three times more than similar providers in the community." (Doc. # 205 at 7).

Doctors Hospital counters that the Court cannot consider these prices, and that Day thus offers no evidence as to market analysis, because these prices are unauthenticated. (Doc. # 211 at 10). Additionally, the Hospital posits that the prices constitute inadmissible hearsay under Federal Rule of Evidence 801 and Federal Rule of Civil Procedure 56(c)(2). (Id.). Day responds that these price lists are admissible as they fall under the "market reports" hearsay exception under Federal Rule of Evidence 803(17). (Doc. # 207 at 3).

Declarations opposing a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, unauthenticated documents generally cannot be considered on a motion for summary judgment. Mobile Telecomms. Techs. LLC v. United Parcel Serv., Inc., No. 1:12-cv-03222-AT, 2015 WL 11199065, at *7 (N.D. Ga. Mar. 25, 2015). However, "courts may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial." Edwards v. Gwinnett Cnty. Sch. Dist., 977 F. Supp. 2d 1322, 1329 (N.D. Ga. 2013) (citation omitted).

Similar to unauthenticated evidence, hearsay statements typically "cannot be considered on a motion for summary judgment." Verna v. Pub. Tr. of Miami-Dade Cnty., 539 F. Supp. 2d 1340, 1350 (S.D. Fla. 2008). But again, "a district court may consider a hearsay statement for summary judgment purposes, provided the statement can be reduced to [an] admissible form at trial." Action Sec. Serv., Inc. v. Am. Online, Inc., No. 6:03-cv-1170-ACC-DAB, 2005 WL 1529578, at *1 (M.D. Fla. June 28, 2005).

Although Day does address the hearsay issue, arguing that the price lists fall under the exception to the rule against hearsay found in Federal Rule of Evidence 803(17), which excludes "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations," he does not address the authentication issue. Fed. R. Evid. 803(17); (Doc. # 207 at 3). Because Day offers no support for the contention that this evidence – which is supported only by a weblink to the hospitals' websites in two footnotes of his response to the instant Motion – could be authenticated at trial, it cannot be considered at the summary judgment stage. (Doc. # 186 at 17 n.3, n.4); see Hill v. Lazarou Enters., Inc., No. 10-61479-CIV, 2011 WL 124630, at *3 (S.D. Fla. Jan. 14, 2011)

("The police report (Exhibit 4) filed by the defendant in the instant case is unauthenticated. The defendant has not made a *prima facie* case that the police report (Exhibit 4) is what it purports to be. Accordingly, the Court should not consider the unauthenticated police report (Exhibit 4) in ruling on the defendant's motion for summary judgment." (citations omitted)); <u>Bowe v. Pub. Storage</u>, 106 F. Supp. 3d 1252, 1262 (S.D. Fla. 2015) ("Ms. Haga's declaration does not even state who accessed the website[,] . . . and no SafeStor employee has been deposed regarding the contents of its website. Accordingly, Exhibit 11 to Ms. Haga's declaration will be stricken." (emphasis omitted)); <u>Z Indus. USA, LLC v. Circuitronix, LLC</u>, No. 0:17-cv-60727-UU, 2018 WL 3412854, at *16 (S.D. Fla. June 20, 2018) ("Chrom has provided *no authenticating testimony*, nor even a screenshot of the website, that would permit the Court to determine that the URLs Chrom cites contain the alleged representation, nor that the URLs currently hyperlink to the same websites that Chrom visited on the date of the Counterclaim in October, 2017." (emphasis in original)).

Assuming, however, that this evidence could be rendered admissible, the Court echoes some of the Hospital's concerns regarding its helpfulness. First, the prices derive from

current price lists, whereas Day's treatment occurred in 2017. (Doc. # 205 at 7 n.1) (noting that these price lists reflect what the hospitals "currently" charge). In theory, the other hospitals' fees for these services could have been higher in 2017. Additionally, it may very well be true that these hospitals have different costs, such that they are able to charge less for these services. Indeed, Day provides no evidence that the other hospitals are similarly situated to Doctors Hospital, other than their location. And, it is also possible that these billing codes include different services – such that a "level three emergency visit" would include different treatments at Doctors Hospital and at Sarasota Memorial. (Doc. # 199 at ¶ 8).

Still, if this evidence could be considered, and viewing the evidence in the light most favorable to Day, a reasonable jury could find that the differences between these hospitals' prices helps support an inference that Doctors Hospital's charges are unreasonable. See Colomar I, 461 F. Supp. 2d at 1270 ("There is little doubt that what the market charges for similar services is one relevant measure of reasonableness.").

### b. **Differential Pricing**

The Court turns to the next factor in the reasonableness

inquiry – the "rate a hospital charges other patients for the same services." Colomar II, 2007 WL 2083562, at *5. "[C]ombined with other evidence, differential pricing might establish that certain hospital charges are unreasonable." Id. at *5 (citing Hillsborough Cnty. Hosp. Auth. v. Fernandez, 664 So.2d 1071, 1071-72 (Fla. 2d DCA 1995)).

Here, Day offers two types of differential rates: (1) the amounts Medicare would have paid, and (2) those that certain private health insurance companies would have paid. (Doc. # 205 at 7-12; Doc. # 186 at 8, 17-19). As an initial matter, the Court notes that the Medicare rates Day offers are unhelpful for these purposes, as they derive from physician fee schedules, rather than hospital schedules. (Doc. # 211 at 11); see Am. Hosp. Ass'n v. Azar, 964 F.3d 1230, 1235 (D.C. Cir. 2020) ("Physician offices are generally reimbursed at a lower rate for a given service than hospitals, because hospitals receive a separate 'facility' rate inapplicable to freestanding physician practices."); All Fam. Clinic of Daytona Beach Inc. v. State Farm Mut. Auto. Ins. Co., 685 F. Supp. 2d 1297, 1301 (S.D. Fla. 2010) (explaining that the "Outpatient Prospective Payment System" used for hospital reimbursements "is an entirely separate component of the Medicare B program from the participant physicians

schedule"). Day does not appear to address this issue.[1]

Turning to private insurance contracts, Day offers Doctors Hospital's contract with one insurer ("Insurer A") for certain outpatient services. (Doc. # 205 at 9). Under this contract, a patient would pay $965.00 for the same services Day received – as compared to the $2,332.50 he was charged. (Id.; Doc. # 194-3 at 9). Although Doctors Hospital argues that these outpatient rates are not comparable to the emergency care received by Day, the Hospital's own expert analyzed the Insurer A contract "to determine the applicable rate for the services provided to . . . Day." (Id. at 8).

Still, this evidence of a lower rate is rebutted by the other managed care contracts. Indeed, if Day was covered by another private insurer's policy ("Insurer B"), the rate would be $2,946.00 – which is more than the $2,332.50 Day was

_____

1. Although Day argues in his reply to his own Motion that, based on certain overall net-to-gross ratios, the fees reimbursed by Medicare would be significantly lower than those charged to Day, the Court does not find this method of calculation reliable without more information, given that no party avers that all services provide the same or even similar profit margins. (Doc. # 207 at 6). Still, even taking this information as true, considering the only admissible evidence available, the Court reiterates the holding that "differential pricing is not enough, 'standing alone,' to prove unreasonableness." Colomar II, 2007 WL 2083562, at *5 (quoting Fernandez, 664 So.2d at 1072); see also Colomar I, 461 F. Supp. 2d at 1269 ("[N]o single factor can be used to determine the reasonableness of [a hospital's] charges.").

expected to pay following the PIP statutory 25% discount. (Doc. # 194-3 at 9). Similarly, if Day were covered by yet another insurer ("Insurer C"), the rate would have been $2,070, which is not significantly higher than Day's rate. (Id.). Considering that managed care contracts bring a number of benefits to hospitals, including by "steering significant non-emergency volume to the hospital," it is not surprising that certain health insurance contracts provide for lesser rates accepted by the Hospital than what Day was expected to pay. (Doc. # 194-3 at 11).

And, although Day argues that these other contracts should not be considered because they involved bundled services, the Court does not find this argument compelling. (Doc. # 205 at 10). Although the contracts with Insurer B and C are for bundled services, what matters for comparison purposes is not how these services are delineated in the contracts themselves – but what a patient would have been expected to pay with PIP insurance versus with private health insurance, and those are not dissimilar. And, if the Court took Day's argument to its logical conclusion, this would essentially eradicate consideration of differential pricing as to private insurers, which generally contract with hospitals on fees based on service bundles, rather than on a

line-by-line basis, as noted by Day's own expert, Kevin McCarty. (Doc. # 193-1 at 151:13-21) ("Q. Is it your position that commercial health insurance companies are reimbursing for [emergency department] visits on a line-by-line basis? A. No, it's not. No. I said earlier that when they have a global contract, they may not even be looking at the [current procedural terminology medical billing ("CPT")] codes. They're moving away from CPT codes.").

Because several insurance companies are expected to pay similar rates to that of Day for the same or similar services, the Court finds that no reasonable jury could conclude that that the Hospital's rates are unreasonable by virtue of differential pricing. Indeed, that argument is negated by the evidence presented. Accordingly, this factor favors the relief requested in Doctors Hospital's Motion.

### c. <u>Internal Cost Structure</u>

Lastly, the Court considers the Hospital's internal cost structure. <u>Colomar II</u>, 2007 WL 2083562, at *6. However, Day has proffered no evidence of the Hospital's cost structure that might lend to a conclusion that its charges are unreasonable. Indeed, Day only argues in its own Motion that Doctors Hospital "utilizes an across-the-board rate increase that only considers specific costs with regard to supplies

23

and pharmaceuticals." (Doc. # 186 at 19). But the Court fails to see how across-the-board increases are unreasonable, giving that hospitals should factor the increase of expenses, such as salary and overhead increases, in calculating service charges. Accordingly, this factor favors Doctors Hospital.

### d. **Application of the Colomar Factors**

The Court has determined that, even viewing the facts in the light most favorable to Day, no reasonable jury could conclude that Doctors Hospital's internal cost structure or pricing comparisons make its charged rates unreasonable. Although the market-analysis factor might point toward such a result, the Court has found such evidence inadmissible. Even so, "[w]hile evidence of what others in the market charge for similar services is a necessary factor[,] it is not a sufficient one in and of itself." Colomar I, 461 F. Supp. 2d at 1271. Indeed, "no single factor can be used to determine the reasonableness of [a hospital's] charges." Id. at 1269. Because Day has offered no proof of any other factor that might lead a jury to find Doctors Hospital's charges unreasonable, Day has failed to demonstrate an unfair practice under FDUTPA.

And, although Day argues that the Hospital should have considered the aforementioned Colomar factors in determining

24

its fees to begin with, this is not what the law says. <u>See</u> Fla. Stat. § 627.736(5)(a) ("In determining whether a charge for a particular service, treatment, or otherwise is reasonable, consideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, reimbursement levels in the community and various federal and state medical fee schedules applicable to motor vehicle and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply."). <u>Colomar</u> does not impose additional duties on hospitals not provided for in the PIP statute. Instead, <u>Colomar</u> explains factors that may be considered in determining whether a hospital's charges are reasonable. <u>See Colomar I</u>, 461 F. Supp. 2d at 1269 (discussing these factors so as to analyze the reasonableness of the hospital's charges after-the-fact, rather than imposing a duty on the hospital to analyze them). Such a result would place an untenable duty on hospitals to calculate each of their thousands of services based on these factors, including market analyses, which they are not necessarily in the best position to conduct, and reimbursement levels in the community, which might be unavailable to hospitals due to confidentiality agreements.

(Doc. # 211 at 8 n.4).

Additionally, as to Day's argument that Doctors Hospital's "practice of not providing patients with itemized bills nor informing patients of their right to obtain itemized bills" constitutes an unfair practice under FDUTPA, neither party highlights any evidence of this practice. (Doc. # 46 at ¶ 105). To the contrary, Day appears to have dropped this aspect of Count II. See (Doc. # 205 at 17) ("The subject of Plaintiff's FDUTPA claims is Doctors Hospital's deceptive and unfair practice of charging inherently unreasonable and unfairly inflated rates. Nowhere in Plaintiff's FDUTPA claim is there any claim that Doctors Hospital must provide more price transparency or further inform patients about what they might pay for hospital services."). Accordingly, Doctors Hospital's Motion is granted as to Count II.

### 3. **Breach of Contract**

In Count III, Day alleges that Doctors Hospital breached the COA "by charging unreasonable amounts for PIP-covered" services. (Doc. # 46 at ¶ 118). Because the Court has already determined that, even making all reasonable inferences in Day's favor, he has failed to provide sufficient evidence demonstrating that the Hospital's charges are unreasonable, Day's breach of contract claim fails as well. Accordingly,

26

Doctors Hospital's Motion is granted as to Count III.

### 4. **Declaratory Relief**

In Count VI, Day seeks a declaration that Doctors Hospital's charges are unreasonable and that he therefore is not responsible for the charges he has not yet paid. (Doc. # 46 at ¶¶ 136-143; Doc. # 186 at 9). Again, because the Court has found that, taking the evidence provided, the Hospital's charges are not unreasonable, Day's claim for declaratory relief fails. Accordingly, Doctors Hospital's Motion is granted as to Count VI.

### B. **Day's Motion**

In Day's Motion, he seeks an entry of judgment in his favor on Counts I, II, III, and VI, of the second amended complaint. (Doc. # 186). Because the Court has already found it proper to enter judgment in Doctors Hospital's favor on all of those remaining counts, Day's Motion is denied.

## IV. **Conclusion**

The Court finds summary judgment for Doctors Hospital appropriate as to Count I because Day has failed to show that a reasonable consumer would be deceived by the Hospital's conduct. Summary judgment in Doctors Hospital's favor is proper as to Counts II, III, and VI, because Day has failed to carry his burden of demonstrating that the Hospital's rates

27

are unreasonable. Indeed, the evidence provided points to the contrary.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Sarasota Doctors Hospital, Inc.'s Motion for Summary Judgment (Doc. # 187) is **GRANTED** as set forth herein. Plaintiff David Day's Motion for Summary Judgment (Doc. # 186) is **DENIED.**

(2)   The Clerk is directed to enter judgment in favor of Doctors Hospital and against Day.

(3)   Thereafter, the Clerk is directed to close the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 28th day of January, 2021.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE